MEKE, Respondent, v. NICOL, Appellant: GRUNDY, Defendant.

*No. 244. Argued November 28, 1972.—Decided January 3, 1973.*
(Also reported in 203 N. W. 2d 129.)

For the appellant there were briefs by *Leo H. Hansen* and *Hansen, Eggers, Berres & Kelley, S.C.,* all of Beloit, and oral argument by *Leo H. Hansen.*

For the respondent there was a brief by *Korth, Rodd, Sommer & Mouw, S.C.,* attorneys, of Rhinelander, and *William E. Schirger* of counsel, of Rockford, Illinois, and oral argument by *Richard E. Sommer.*

HANLEY, J.   The following issues are presented on this appeal:

1.   Did the trial judge err in admitting evidence of defendant's financial worth?

2.   Did the trial court err in admitting certain evidence as tending to show intent?

3.   Was the jury's verdict a product of passion and prejudice such that it would preclude application of the *Powers* rule?

4.   Did appellant timely serve and file the transcript on appeal?

*Evidence of Nicol's worth*

Defendant contends that the admission into evidence over his objection of a letter from himself to his daughter, Joyce, which related solely to his financial worth was prejudicial in that it was offered solely to establish his wealth for purposes of punitive damages.   The letter read as follows:

"January 28, 1970

"Dear Joyce:

"I have some real hot news for you and that is the only reason I am writing.   It has been my lifes [sic] ambition to leave a very lucritive [sic] legacy to my children but now all of my hard labor and that of your mother has been for naught, because your erstwhile ex-husband has sued me for a million one hundred thousand dollars. Don't laugh it is true . . . So every episode that happened in Wisconsin between you and your ex-husband you jot down.   Oh yes, Larry is also being sued for a million one hundred thousand dollars too. . . .

"The weather is beautiful today, a very light breeze and about 78 degrees and I am going to enjoy every bit of it as apparently I won't be here to enjoy it very much longer because if I refuse to pay this 1,100,000 they can probably put me in jail.

"Well this has shook me up so terribly that I can't think of anything else to say so send me your condolences by return mail.   Once again I hope you don't think this is a joke.   It is not a joke.

"Love from MOM AND POP

"P. S. In view of all this you had bettee [sic] tell Larry to have Mike rubbed out completely, he would save 2,200,000 hah, hah.

"I have filed a counter-claim against Mike for $100,000.

"As mentioned over the phone am enclosing a copy of the complaint. Do not show this to anyone. Be sure you don't."

When the letter was read to the jury all references to the amount prayed for in plaintiff's complaint were omitted. Although defense counsel had no objection to the letter so long as it was read in its entirety, he did object to it being allowed to go into the jury room. When the letter was in fact sent to the jury room, the reference to the $1,100,000 had not been blocked out. Obviously, when the letter was read to the jury without reference to the $1,100,000 there was no need to object by defendant's counsel.

Likewise, defendant contends that there was other evidence offered to prove his financial worth: An offer to purchase in the amount of $130,000 from plaintiff to defendant for property owned by defendant in Illinois. A letter from defendant to his daughter referring to a Mexican vacation and to a camping trailer recently sold; and a specific question to defendant of whether or not he owned Florida property.

Plaintiff argues, however, that all of this evidence was introduced not for the purpose of proving defendant's wealth, but rather served the legitimate purpose of helping to prove his case in chief. We disagree. The whole thrust of plaintiff's questions and exhibits was to show that defendant Nicol was a wealthy man.

Although punitive damages may be awarded where there is one judgment against several joint tort-feasors, *White v. White* (1909), 140 Wis. 538, 122 N. W. 1051, evidence of the wealth of any of the defendants is inadmissible. *McAllister v. Kimberly-Clark Co.* (1919), 169 Wis. 473, 173 N. W. 216.

We think it was prejudicial error to admit evidence of defendant Nicol's wealth.

## Evidence of intent

Defendant contends that the trial court erroneously admitted several letters from himself to his daughter. These letters designated at trial as plaintiff's Exhibits 19A [1] and 21A [2] were introduced for the purpose of

[1] The pertinent part of Exhibit 19A read as follows:

"Feb. 14, 1969

"Dear Joyce

"Received your letter of Feb. 11th including title which cause [sic] me at least one hour of bitching, cussing and swearing on what I just knew was going to happen on that title. I told you the deal on the check, I won't go into that again, but I was just sure you would forget to sign that title and have it notarized, which would have meant I would have to send it back to you because we couldn't have it done down here, and I didn't want to have mother forge your name on the title, that could be serious, the check is bad enough. But the title arrived all signed, sealed notarized and delivered. So now they can only send mother to Alcatraz on one count, forging your name on the check. In court I will say I never saw her before in my life. I am supposed to be able to cash the check Monday, the 17th, wish us luck. I am still concerned about the guy, I don't trust him.

"I am very positive that Mike won't be foolish enough to try to sue you for anything. Nicolosi is a shyster lawyer but he is not that stupid. And he can't sue you for anything on the boat, it would be us if anybody, because we have the controlling interest, not him. And he hasn't got a scrap of paper anywhere to show he paid 2¢ in on that boat. So to be compensated for that boat he has to get down and beg us, there is no other way, and he had better be polite about it or he will get nothing. Also there isn't a court in the land that would allow him his share of the boat new, he has to take his depreciation just the same as you do and we do. To think otherwise on that would be rediculous. [sic] And . . . I believe it is going on either 3 or 4 years old.

"Now in regards to the furniture, and I have mentioned this to you before, outside of the stero [sic] that is his and that he owned before you were married, you paid for all the rest, you told me by checks of your own. You can slso [sic] prove thru me that he was using all of his money to pay for the property in Peca-

showing the defendant's intent as well as to impeach the testimony of defendant. Defendant argues that neither of the exhibits show intent and that they were actually introduced to show his character and to cause the jury to become prejudiced against him and that this

tonica, that is why he paid nothing on the furniture. It will also be very easy to prove in court that he is a mental case and I will be more than glad to appear for you. So I don't think you have a thing to worry about at all, no lawyer is going to [sic] foolish enough to advise him to try this. You very definitely have the whip hand and I know that any lawyer will tell him that, even a shyster alwyer. [sic] Also if he does sue there is a strong possibility with him not having one shred of evidence to prove his case in any way, that by requesting the court, you could make him pay for your court costs also by he not having a case in the first place.

"..."

[2] The pertinent part of Exhibit 21A read as follows:

"Feb. 25, 1969

"Dear Joyce

"...

"Speaking of Mike and it seems to be the main topic of every letter between you and I, but then I guess we can't get away from the bastard, but they say it's an ill wind that blows no good, and at least he gives us something to bitch about. Your offer to take me on a nice long trip with me paying all the expenses sounds like you are inviting me to a duck dinner and I bring the duck.

"I hope that your last ski trip was an enjoyable one, and that the school forgets your $49.50. Getting back to Mike, we got a letter from him yesterday, signed receipt requested with all the payments that we had made to him all itemized. But of course he didn't have them added up correctly, that is where $100 mistake was made in addition. In fact he didnt [sic] add it up at all, he just listed them and put the total up at the top instead of the bottom. So I am thinking that he probably knows the mistake was there allright [sic] but wasn't going to say anything. I also explained to him the $512 that he didn't have coming, all this explaining took a full typewritten page. I sent the letter to Keegan (carbon copy of that is) told him to read it and then mail it to Nicolosi. I told Mike he could go back to the bank and pick up his checks with the corrected amount taken care of. Now if he gets mad and lets them sit there for another 3 or 4 months I will just take the money and invest it. So long as he isn't following

error had a substantial effect on the jury's finding that he had committed the alleged assault and battery and false imprisonment.

The primary question before the jury was whether defendant had actually intended to shoot the plaintiff and, if so, whether he was acting in self-defense. This intent must be collected by the jury from the circumstances of the case. *Brabazon v. Joannes Brothers Co.* (1939), 231 Wis. 426, 436, 286 N. W. 21. On the other hand, evidence of the general character or reputation of the parties in an action for assault and battery may not be introduced merely for the purpose of raising a presumption favorable to one party or unfavorable to the other. 6 Am. Jur. 2d, *Assault and Battery,* p. 176, sec. 226.

These exhibits were actually evidence of defendant's character. Although they showed ill feelings by George Nicol toward Meke, they made no reference to Nicol's intentions. Since the exhibits did not evidence any intent, it was error to admit them.

The question arises whether the admission of the exhibits above referred to constituted prejudicial error.[3]

If these letters had not been admitted into evidence, the only facts showing intent are those surrounding the

---

you around any more, if that is still true, I wouldn't bother my head thinking about him if I were you, or any of the deal you had with him, just forget the idiot. If he ever does come around to dealing give him what the boat is worth as of that day, not what it was worth when it was new.

" . . ."

[3] Sec. 274.37, Stats., provides: "No judgment shall be reversed or set aside or new trial granted in any action or proceeding, civil or criminal on the ground of misdirection of the jury, or the *improper admission of evidence,* or for error as to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire record or proceeding, it *shall appear that the error complained of has affected the substantial rights of the party* seeking to reverse or set aside the judgment or to secure the new trial." (Emphasis added.)

shooting. Meke testified that Nicol pulled out his pistol, aimed and shot him. At trial, Nicol testified that when he was absolutely certain that plaintiff was going for a gun he jerked his gun from his pants pocket, but that it stuck on the way out actually discharging through his pants pocket. At a deposition taken from the defendant the day after the shooting, he stated: ". . . I thought he was going to go for a gun and I had mine in my pocket and I did withdraw it and planned to shoot at the floor to throw him off balance. I fired the gun. How it hit him I still don't know. I didn't aim at him. It must have ricocheted." Nicol told officers investigating the incident that he "shot for the man's wrist, thinking he was going for a gun."

Plaintiff contends that on the basis of the conflicting and contradictory testimony given by the defendant the jury was entirely justified in disregarding any of his testimony as to how the shooting occurred. If this were all of the defense testimony, plaintiff's contention would be correct. However, there was undisputed testimony that the bullet ricocheted off Meke's right knee without breaking the clothing and lodged in his right forearm just below the elbow. The jury could have believed that if Nicol had intended to harm Meke he would not have missed at such a close range and clearly would have fired the gun a second time which he did not do. Also that he would not have called the police to come over prior to Meke's arrival at the cottage if he had any intent to harm the plaintiff. Without the letters, it is possible that the jury would have believed from all of the evidence that Nicol did not intend to commit assault and battery. The admission of the letters affected Nicol's substantial rights. It would have produced a result that would have been more favorable to Nicol if they had not been received.

The same reasoning applied to Nicol's intent to falsely imprison Meke. Meke testified that after his arrival at

Nicol's cottage he sat in a chair while Lawrence Grundy pointed a shotgun toward him. Nicol told Meke to stay in the chair when he tried to leave. On the other hand, Nicol testified that he ordered Meke out of the cottage twice before the shooting but Meke would not leave. The jury could have believed either Meke or Nicol. Without the letters, it is possible that the jury would have believed Nicol and found he did not intend to falsely imprison Meke.

We conclude from the entire record that the error complained of has affected the substantial rights of defendant Nicol.

*Perversity of verdict*

Defendant Nicol contends that the verdict was the result of passion and prejudice and that since the *Powers* rule is inapplicable to cases where an excessive verdict is so motivated, it was error for the trial court to reduce damages and to give plaintiff his option of selecting either the reduced amount or a new trial on the issue of damages alone.

Defendant bases his contention of perversity by making a comparison of the size of the verdict with the injury. The jury awarded $20,000 for Meke's injuries.

As a result of the injury, Meke had medical bills of $35. The hospital reports indicated that the bullet grazed his knee but there was no break in the skin. The bullet ricocheted off his knee and penetrated two centimeters into his forearm. There was no medical testimony in reference to the injury.

Meke testified that he did not realize he had been shot and that he pulled the bullet out of his arm. He further stated that he had no disability of any kind and the arm did not bother him in any way at the time of trial.

In regard to compensatory damages for false imprisonment, the record does not reveal serious injury. Meke testified he arrived at the Nicol cottage between 8:30 p. m. and 9 p. m. Officer Neff of the Minocqua

Police Department testified he received a call to come to the cottage at 9:15 p. m. and that he arrived fifteen minutes later. The record showed Nicol had phoned for the police prior to the time Meke arrived at the cottage. Although Meke was restrained by a shotgun, he was only imprisoned or restrained for a period of from fifteen minutes to one-half hour.

Defendant also contends that the verdict of $47,000 punitive damages is excessive when compared to the fines in the relevant provisions of the Wisconsin Criminal Code.

In *Lisowski v. Chenenoff* (1968), 37 Wis. 2d 610, 634, 155 N. W. 2d 619, this court said that since punitive damages are assessed for punishment only, it is relevant to compare the verdict for punitive damages to the maximum fine in a section of the Wisconsin Criminal Code that contains a similar offense.

In the present case, corresponding criminal statutes would warrant an imposition of fines in the total maximum penalty of $3,500. Here the jury found punitive damages of $47,000, over 13 times as much.

We think that the gross disproportion between plaintiff's proven compensatory damages and the verdict, coupled with the very large award of punitive damages which was enhanced by the admission of erroneous evidence concerning defendant Nicol's wealth, gave rise to a duty on the part of the trial court to set the entire verdict aside rather than attempting to cure it by invoking the *Powers* rule.

*Timely filing of transcript*

Plaintiff contends that this appeal should be dismissed because the transcript was not timely filed. He made essentially the same argument in a motion to strike the transcript, which this court denied on February 9, 1972. It would appear that whatever delay which occurred in filing the transcript was not due to any

dilatory motivation on the part of defendant-appellant [4] nor has the respondent been in any way prejudiced. *Gateway City Transfer Co. v. Public Service Comm.* (1948), 253 Wis. 229, 232, 33 N. W. 2d 134. Therefore, the decision of the trial court to extend the time for filing the transcript pursuant to sec. 274.32, Stats.,[5] was correct.

It is our conclusion that there must be a new trial as to all issues in this case since prejudicial errors occurred at the trial in the admission of evidence of financial worth of defendant Nicol together with the admission of evidence showing character rather than intent of defendant Nicol.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.

---

[4] Affidavits indicate that the delay was largely due to the inability of the court reporter to timely transcribe and have typed his stenographic notes.

[5] Sec. 274.32, Stats., provides: "**Amendments.** When a party shall in good faith give notice of appeal and shall omit, through mistake or accident, to do any other act to perfect the appeal or make it effectual or to stay proceedings, the court from which the appeal is taken or the presiding judge thereof, or the supreme court or one of the justices thereof, may permit an amendment or the proper act to be done, on such terms as may be just."